ZEHMER, Chief Judge.
Employer and Carrier appeal a workers’ compensation order awarding Claimant wage loss benefits pursuant to a compensable accident that occurred on August 20, 1988. Wage loss benefits had been paid until terminated by the employer and carrier on November 4,1988. The Judge of Compensation Claims rejected Employer and Carrier’s contention that subsection 440.15(3)(b), Florida Statutes (1991), precluded as a matter of law the finding of permanent impairment because it was based solely on subjective complaints by the claimant. We reject Employer and Carrier’s proposed construction of this recently enacted statutory provision and affirm the appealed order.
I.
The factual and legal issues are adequately discussed by the Judge of Compensation Claims in the order under review. That order reads in pertinent part:
It was the position of the claimant that she is entitled to wage loss benefits for the time period from 11-4-89 to 9-20-91 pursuant to forms previously submitted, including interest thereon. Further, claimant claims entitlement to costs and attorney’s fees, with the latter being based on Florida Statute 440.34(3)(b).
The position of the employer/carrier was that claimant has been paid all benefits due, and she is not entitled to wage loss since 11^4-89, and that no costs or attorney’s fees are due.
Upon hearing the testimony, observing the witness and her demeanor, and from the stipulations and all of the evidence presented, the undersigned resolves all conflicts in the evidence and makes the following findings of fact and conclusions based thereon.
1. I find that the above stipulations numbered one through six are proper and are herewith accepted.
2. I find that the claimant was involved in an industrial accident on 8-20-88, sustaining a right foot injury as indicated in the medical records. All parties acknowledge that claimant has reached MMI on 6-7-89.
*1002 3. Claimant -returned to work on a light-duty capacity with the employer, Gates Energy Products, after claimant’s 8-20-88 accident and injury. Claimant’s light-duty job allowed claimant to work in a sitting position with claimant’s injured right foot propped up level with her chair. Claimant was terminated from her light-duty sitting job at Gates Energy on 10 — 18— 88.
Claimant began treating with Dr. Lane, an authorized treating physician, on 9-20-88. As of 11-1-88, Dr. Lane had Ms. Wheeler on off-work status. On 11-9-88, Dr. Lane told claimant that she could return to a sitting job only as of 12-1-88.
On 6-7-89, Dr. Lane placed claimant at MMI with a zero percent PPI rating. However, Dr. Lane stated in his 6-7-89 office note that claimant “has some burning and numbness about the fifth MTP joint, and some radiating numbness distally.” Dr. Lane testified that said observations were based on claimant’s complaints. Despite placing claimant at MMI, Dr. Lane continued claimant’s work restrictions of a sitting job only. On 6-7-89, Dr. Lane referred claimant to Dr. Fry for his opinion.
On 8-18-89, Dr. Fry conducted an examination and an evaluation of claimant. He found claimant had a sensory deficit in the terminal ends of the superficial cutaneous nerves. Dr. Fry assigned claimant a 1% permanent partial impairment to the body as a whole based on loss of function due to sensory impairment pursuant to the AMA Guidelines.
Claimant has continued to treat with Dr. Lane for claimant’s foot injury, her most recent office visit being on 8-27-91. Dr. Lane’s office records and his deposition testimony show that on each of claimant’s office visits since 11-9-88, through at least 12-14-90, Dr. Lane recommended that claimant limit herself to a sitting job or that claimant “continue her current regimen.” Dr. Lane’s office notes and his deposition testimony do not show that Dr. Lane ever communicated to claimant that she was released to full duty work without restrictions. The undersigned accepts as credible the claimant’s testimony that Dr. Lane’s continuing advice to her was to limit herself to a sitting job and that Dr. Lane never communicated to her that she was released to full duty without limitations or restrictions.
The undersigned accepts as creditable the following uncontroverted testimony of the claimant in regard to claimant’s foot injury: That she suffers from intermittent pain and numbness in varying degrees in her right foot; and that her pain and numbness are aggravated by excessive standing or walking.
Claimant began to do a recorded job search in December, 1988, after her release to a sitting job by Dr. Lane. Claimant testified that from December, 1988, to the present time and continuing, she has uninterruptedly continued to perform her job search. Unfortunately, claimant’s job search has been entirely unsuccessful. The employer/carrier conceded and stipulated during the merits hearing that claimant has performed an extensive good faith job search. Indeed, claimant’s uncontro-verted testimony and job search documents show that claimant generally looked for at least fifteen jobs every two weeks, that she utilized the state job service, job hotlines, newspapers, and word-of-mouth in her unsuccessful search for employment. During claimant’s job search, claimant searched for jobs that required only limited walking or standing. The undersigned accepts claimant’s testimony that she searched jobs with limited walking or standing because she continued to have right foot problems and because she reasonably believed that Dr. Lane’s recommendation was a sitting job only.
The undersigned finds that the carrier controverted and discontinued paying claimant wage loss benefits as of 11-4-89 and has paid no further wage loss benefits through the date of this hearing.
The undersigned recognizes that during all times from November 4, 1989, to the present, claimant has performed a continuous, extensive and good-faith job search as conceded by employer/carrier during the merits hearing.
*1003 The undersigned recognizes that claimant has a 1% impairment rating pursuant to the AMA Guides, according to Dr. Fry’s uneontroverted testimony. The Employer/Carrier argues in its Bench Memorandum that the 1% impairment, which Dr. Fry specifically stated in his report, was based on the AMA Guidelines, is no impairment at all because the rating was subjective and not pursuant to the schedule adopted by the statutes as required. The E/C seems to suggest that any indication or response given by a claimantypa-tient during a test is not an objective finding and therefore disallowed by the AMA Guides in the determination of an impairment rating. Many of the tests as set forth and prescribed in the AMA Guides have some subjective component to them whereby the claimant/patient must give some type of response, whether it be a strength test, range of motion test or sensory loss test.
The Guides to Evaluation of Permanent Impairment, (3rd ed. 1988), make specific reference to permanent impairment based on loss of sensation in Table 10, entitled Grading Scheme and Procedure for Determining Impairment of Affected Body Part Due to Pain, Discomfort or Loss of Sensation. Similar information is also set forth in the Guides to Evaluation of Permanent Impairment, (2nd ed. 1984), in Table 4, entitled Grading Scheme and Procedure for Determining Impairment of Affected Body Part Due to Pain, Discomfort or Loss of Sensation.
The Employer/Carrier’s Bench Memorandum cites Maggard v. Simpson Motors, 451 So.2d 529 (Fla. 1st DCA 1984), for the proposition that the existence in degree of permanent physical impairment must be proved by testimony based on the AMA Guidelines and cannot be based on claimant’s complaints of pain alone.
In the instant case, there was competent substantial evidence that the 1% impairment rating assigned to claimant by Dr. Fry was based on the results of Dr. Fry’s examination of claimant. Dr. Fry testified that he performed a pinprick test which solicited a finding of decreased sensation over the top and outside of claimant’s right foot. In the Maggard case, the court noted that the doctor had done no testing whatsoever on claimant Maggard. The doctor in that case even acknowledged that he did not and could not use the AMA Guidelines. In contrast, Dr. Fry performed a thorough examination and multiple tests on Ms. Wheeler and rated her in accordance with the AMA Guides as above stated.
The Employer/Carrier argues in its Bench Memorandum that even if claimant is found to have permanent impairment, claimant’s claim for wage loss benefits should be denied because the claimant has no work restrictions. This argument is rejected pursuant to the below cited case law.
In Iverson v. Holy Cross Hospital, 498 So.2d 620 (Fla. 1st DCA 1986), on facts similar to the instant ease, the claimant sustained an industrial injury resulting in a 2% permanent impairment rating, was released to return to work with no restrictions or limitations and claimed wage loss. The 1st DCA stated, relying on the well known case of City of Clermont v. Rumph, 450 So.2d 573 (Fla. 1st DCA 1984), “that a claimant’s burden is satisfied by showing a change in employment status due to the injury and an adequate and good faith attempt to secure employment ... so as to establish prima facia [sic] an economic loss”. Once a claimant shows such wage loss, the burden is upon the employer/carrier to demonstrate a voluntary limitation of income or refusal of work.
In the instant case, the claimant satisfied her burden according to Iverson. Ms. Wheeler’s employment status was changed from full duty employment to limited duty employment due to the industrial injury. She made “an adequate and good faith attempt to secure employment”, as conceded by the employer/carrier. Employer/Carrier did not demonstrate that she voluntarily limited her income or refused to work.
More recently in Davis v. Broward County Health Department, 570 So.2d 371 (Fla. 1st DCA 1990), the 1st DCA has held that “... it is a permanent impairment *1004 rating, not the existence of physician imposed restrictions, that is a prerequisite to a wage loss claim.”
The First DCA went on to say [in] Davis at 374 that:
A claimant with a permanent impairment rating has some ‘physical limitation,’ and can establish his wage loss claim by demonstrating a causal connection between the physical limitation and his earnings. Although physician-imposed restrictions are a means of establishing causal connection, the claimant may also offer an extensive but unsuccessful job search as proof. (Citing Certified Grovers [sic] v. Conerty, 529 So.2d 1201, 1203 (Fla. 1st DCA 1988).
The undersigned rejects E/C’s argument that claimant’s claim for wage loss benefits must be denied due to no physician-imposed work restrictions. The undersigned therefore finds that based on the medical facts of this case releasing claimant with a 1% impairment rating and further finding that the claimant has met her burden of showing an adequate and good faith attempt to secure employment that claimant has established 'prima facie economic loss and that the claimant in this case is therefore entitled to receive wage loss benefits.
The record contains competent, substantial evidence to support the Judge of Compensation Claims’ findings of fact, and we perceive no legal error in the ruling for the following reasons.
II
Subsection 440.15(3)(b) sets forth the requirements for an injured worker to recover wage loss benefits after reaching maximum medical improvement. Prior to the 1990 amendment to that subsection, an injured worker seeking wage loss benefits was required to establish a permanent impairment “determined pursuant to the schedule adopted in accordance with subparagraph (a)3,”[1] and to establish that “such permanent impairment results in a work-related physical restriction which affects such employee’s ability to perform the activities of his usual or other appropriate employment.” § 440.-15(3)(b), Fla.Stat. (1989). The schedules required by subparagraph (a)3 establish the different types of permanent impairments that will support a claim for benefits. The 1990 amendments to chapter 440 (see generally, Ch. 90-201, at 894, Laws of Florida) accomplished the following two changes to the statutory requirements for establishing a wage loss claim pursuant to subsection 440.-15(3)(b).
First, the provisions in subparagraph (a)3 regarding the schedule of permanent impairments were materially changed by the addition of an entirely new provision that reads:
3. The three-member panel, in cooperation with the division, shall establish and use a uniform disability rating guide by January 1,1991. This guide shall be based on medically or scientifically demonstrable findings as well as the systems and criteria set forth in the American Medical Association’s Guides to the Evaluation of Permanent Impairment; the Snellen Charts, published by American Medical Association Committee for Eye Injuries; and the Minnesota Department of Labor and Industry Disability Schedules. The guide shall be more comprehensive than the AMA Guides to the Evaluation of Permanent Impairment and shall expand the areas already addressed and address additional areas not currently contained in the guides.
Ch. 90-201, § 20, at 937, Laws of Fla.[2] (Emphasis added.) The language deleted by this *1005 amendment is quoted in note 1, supra. These changes manifest legislative intent to modify and “expand” the types of permanent impairments that will support a claim for benefits.
Second, an additional restriction on the right to recover wage loss benefits was added to the two existing statutory requirements. This additional restriction specifies that the injured worker’s permanent impairment determined pursuant to the newly specified schedules cannot be “based solely on subjective complaints.” § 440.15(8)(b) 1, Fla. Stat. (Supp.1990). This restriction, it is argued by Employer and Carrier, means that even though the evidence establishes in accordance with generally accepted medical standards that a permanent impairment of the type recognized by the specified schedules exists, nevertheless that impairment cannot lawfully provide a basis for wage loss benefits if it “is based solely on subjective complaints.” The statute provides no definition of the term “subjective complaints,” however, so we must look to appropriate definitions of these words to ascertain their meaning.
The word “subjective” is used in medical parlance to mean “pertaining to or perceived only by the affected individual; not perceptible to the senses of another person.” Dor-land’s Illustrated Medical Dictionary, verba subjective at p. 1264 (26th ed. 1981). The word “complaint” is used in medical parlance to mean “a symptom, disease, or disorder.” Id., verba complaint at p. 293. The word “subjective” in ordinary usage has been defined as meaning, “1. a. Proceeding from or taking place within an individual’s mind such as to be unaffected by the external world_ 3. Existing only in the mind; illusory_ 5. Med. Designating a symptom or condition perceived by the patient and not by the examiner.” The American Heritage Dictionary, verba subjective at p. 1211 (2d coll. ed. 1991) The word “complaint” in ordinary usage has been defined as meaning, “1. An expression of pain, dissatisfaction, or resentment_ 3. A cause of physical pain; malady; illness.” Id., verba complaint at p. 301.
Given these definitions of the words “subjective” and “complaint,” we observe an inherent ambiguity in the use of the term “subjective complaints” in the 1990 amendment. In the broadest sense, this phrase would encompass any “symptom, disease, or disorder” that is “pertaining to or perceived only by the affected individual” but is “not perceptible to the senses” of the examining physician. Although “hearing” is one of the senses used by the examining physician, if one were to nevertheless exclude verbal responses of a patient, this broad construction of the two words would appear to exclude from the list of statutorily prescribed permanent impairments all impairments that cannot be actually perceived by an examining physician independent of verbal statements or responses by the patient to the physician.
A more narrow but equally permissible definition of “subjective complaints” would encompass only those complaints of symptoms or disorders made by the patient to the physician concerning which the physician cannot perceive either through his own senses or through the administration of generally accepted medical diagnostic tests and procedures ordinarily relied on by the medical practitioner involved. This narrower construction of the two words is more in accord with the universally recognized fact that physicians have long relied on their patient’s subjective complaints and verbal responses to testing stimuli in arriving at a correct diagnosis and treatment of the patient’s medical condition.
For example, a physician cannot personally perceive a patient’s headache or other pain independently of the patient’s complaint, yet medication is frequently prescribed for such *1006 complaints and they may be permanent in nature. Medical tests to determine the degree of restriction of motion often require the patient’s verbal response to the physician’s manipulation of the body. Similarly, medical tests to determine the extent of loss of visual acuity are often dependent solely on the responses given by the patient to the examining physician; yet, the AMA Guides allows for a finding of permanent impairment based on loss of visual acuity. Likewise, no physician can perceive, through his own senses alone (apart from hearing the patient’s statements), a loss of sensory response in the nervous system independent of a patient’s response to a prick of the skin by a needle or pin or other generally accepted diagnostic procedure. The notion that only an “objectively” proven injury or disease of the body can now be classified as a compen-sable permanent impairment presupposes a level of medical expertise and technology in the field of neurological examination that belies reality:
The sensory part is the most difficult portion of the entire neurological examination, in that the neurologist is dealing with “hearsay evidence,” or at least subjective reports of the patient; at least, at the present, there is no way to evaluate or test heat, cold, touch, pain, pressure, or any other form of sensation, except to ask the patient to report what he feels. The pattern of the examination of the sensory system is based conventionally on neuroan-atomy. Since all modalities of sensation are not transmitted along the same pathways, the strategy has been to design the sensory examination so that all of the major sensory transmitting systems will be assayed.
9 Marshall Houts & Leonard Marmor, Proving Medical Diagnosis and Prognosis § 277.09 (1991).
The critical question, therefore, is whether the legislature intended to broadly exclude from the meaning of permanent impairment all medical conditions that cannot be perceived by physicians through their own senses independently of verbal responses or information furnished by the patient, that is, does the statutory language necessarily exclude all conditions confirmable through generally accepted medical diagnostic tests and procedures that are subjective in nature; or whether the statutory language is only intended to exclude permanent impairments determined “solely” by reference to the patient’s subjective complaints of “a symptom, disease, or disorder” to the physician, thereby continuing to recognize those permanent impairments that are diagnosed through the use of generally accepted medical diagnostic tests and procedures, even though such procedures rely on verbal responses to testing procedures.
Employer and Carrier argue for the broadest definition of the phrase, contending that a permanent impairment determined by a generally accepted medical diagnostic test that relies on verbal responses from the patient is nothing more than a “subjective complaint” and can no longer support an award of benefits. From this argument, it would necessarily follow that the amendatory language excludes many types of permanent impairments that were previously compensa-ble for wage loss purposes if the impairment can be determined only by the administration of a “subjective” medical test.
We see no valid reason to approve this broad construction of the statutory language to defeat recovery of the wage loss benefits awarded in this case. On the contrary, the more narrow construction of the statutory language must prevail so that the amending language does not operate to exclude from compensability those permanent impairments subject to confirmation only through the administration of diagnostic tests and procedures that, although characterized as subjective in nature, are generally accepted and used in the medical discipline involved. This construction of the statute is required by the long standing principle applicable in workers’ compensation cases that when the statutory language employed is ambiguous, we are obligated to adopt the statutory construction that is most favorable to the employee. Daniel v. Holmes Lumber Co., 490 So.2d *1007 1252 (Fla.1986); City of Clermont v. Rumph, 450 So.2d 573 (Fla. 1st DCA), rev. denied, 458 So.2d 271 (Fla.1984).[3] Consistent with this rule of construction, the 1990 amendments manifest legislative intent to broaden the scope and types of permanent impairments compensable under subsection 440.-15(3), not to reduce the number and type of impairments that can support an award of benefits.
Employer and Carrier’s construction of the statute would exclude certain permanent impairments otherwise determined in strict accordance with the AMA Guides based on generally accepted medical standards and diagnostic tests simply because the diagnostic test employed by the physician required total reliance on verbal responses from the patient. In the instant case, such a construction would necessarily result in the significant diminution of Claimant’s right to recover wage loss benefits, even though she has sustained a bona fide permanent impairment under the AMA Guides that can only be diagnosed and rated through subjective medical procedures. Dr. Fry, the physician who opined that Claimant has a permanent impairment, based his opinion on the results of a “pin prick” test administered to the claimant’s right foot. This diagnostic test, as far as this record shows, is a generally accepted medical procedure for determining decreased sensation in the nerves of Claimant’s foot. The Judge of Compensation Claims correctly recognized in his order that the AMA Guides to Evaluation of Permanent Impairment provides for a finding of permanent impairment based on loss of sensation in a worker’s foot, which in this instance was measured by an accepted medical test that depended on the patient’s verbal response to certain stimuli.[4] Furthermore, as the Judge of Compensation Claims correctly observed, “Many of the tests as set forth and prescribed in the AMA Guides have some subjective component to them whereby the claimant/patient must give some type of response, whether it be a strength test, range of motion test or sensory loss test.” The construction given by the Judge of Compensation Claims to the phrase “subjective complaints” in the 1990 amended statute thus recognizes the com-pensability of a permanent impairment of the neurological system that was also deemed compensable under the 1989 version of subsection 440.15(3). For this reason, it is unnecessary for us to address the arguments concerning whether the 1990 amendment should be given effect retroactively or prospectively only.
The order under review is, therefore, AFFIRMED.
BARFIELD and MINER, JJ., concur.

. Subparagraph (a)3 of subsection 440.15(3), Florida Statutes (1989), provided in part:
In order to reduce litigation and establish more certainty and uniformity in the rating of permanent impairment, the division shall establish and use a schedule for determining the existence and degree of permanent impairment based upon medically or scientifically demonstrable findings. The schedule shall be based on generally accepted medical standards for determining impairment and may incorporate all or part of any one or more generally accepted schedules used for such purpose, such as the American Medical Association's Guides to the Evaluation of Permanent Impairment.
[Emphasis added.]

. The amending language to subsection 440.-15(3)(a)3 also provides:
*1005 For injuries after July 1, 1990, pending the adoption by division rule of a uniform disability rating guide, the Minnesota Department of Labor and Industry Disability Schedule shall be temporarily used unless that schedule does not address an injury. In such case, the Guides to the Evaluation of Permanent Impairment by the American Medical Association, shall be used.
Ch. 90-201, § 20, at 937, Laws of Fla. This language suggests that the new statutory requirements for permanent impairment are to be given prospective effect only.

. We stated in City of Clermont v. Rumph:
As Regency Inn thus indicates, in the present case employer/carrier’s suggested construction of the 1983 amendment to § 440.15(3)(b) would seriously imperil the constitutional validity of the workers' compensation law. We are obliged to construe statutory pronouncements in such a manner as to effectuate their constitutionality. See Miami Dolphins Ltd. v. Metropolitan Dade County, 394 So.2d 981 (Fla. 1981). We are also obliged to adopt the statutory construction which is most favorable to the employee. See Kerce v. Coca-Cola — Foods Division, 389 So.2d 1177 (Fla.1980).
450 So.2d at 576.

. Dr. Fry, the examining physician, had previously rated Claimant with a 1% permanent impairment and placed restrictions on her physical activities. He noted in a subsequent medical report that the permanent impairment he had previously given for loss of sensation of peripheral nerves in her foot "is based on her reports of a decreased sensation of peripheral nerve; it is not an objective measurement.” He testified that while he found no objective evidence of anything wrong with Claimant’s foot, he knows of no diagnostic tests that can prove whether or not there is decreased sensation in the foot, and that he had to take the patient’s word for it. He further stated that he had no reason to doubt the authenticity of Claimant's responses to the point of tenderness and pin prick tests.